UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ESTHER WILLIAMS** ) | |
| ) | **RECEIVED** |
| Plaintiff, ) | MAY 2 9 2008 |
| ) | NANCY MAYER WHITTINGTON, CLERK |
| v. ) | Case No. 07-00714 (JDB) U.S. DISTRICT COURT |
| ) | |
| **UNIVERSAL MUSIC GROUP, INC. et al** ) | |
| **AND ROBERT CURINGTON** ) | |
| Defendants ) | |

## DEFENDANT MOTION TO DISMISS FRIVOLOUS LAWSUIT

The Defendant respectively seeks this motion to this honorable court to have this matter thrown out because of the fact that Esther herself has stated in sworn deposition and submission of documents in which she clearly states in her contact with Friends and Company/Joe Bannana that the masters belongs to the Said Company. In Article 5, Section V, of her own contract it says the following: <u>the sole, exclusive and perpetual ownership of, and in masters made hereunder, including, but not limited to, all master recordings, matrices and similar devices, and records or other reproductions of the foregoing, and the performances embodied in the foregoing and in such masters or reproductions, and the copyrights thereon throughout the World.</u> In no less than three paragraphs this fact is clear that Bullseye Records could indulge any third-party it chooses. Furthermore, even the Japanese who she received $5,500 states that she did not successfully prove her ownership of the masters or the publishing copyright of "Last Night Change It All." She submitted this contract herself. She then represented to the Library of

Congress that she is the owner of the copyright and knows that she did not write a word. She admits so in the first request for the admission of the facts that Joe Wheeler wrote it. This frivolous lawsuit should be thrown out because by her own admission, she has no standing in this matter. Mrs. Williams is facing fraud charges of soliciting $5,000 from Sanctuary Records when she knew that she did not pay one dime for the recording of "Last Night Change It All" or writ one word and had this contract in her possession. The copyright is in fact owned by Ashley Brooks Publishing and Temporal Music Inc., which is registered in BMI works and Harry Fox Agency and it can be pulled up online under BMI.com. She is intellectually dishonest when states in her response to "Sentence 17" when asked if she had ever seen the album cover credits on the back of the LP "Let Me Show You" that contains the song "Last Night Change It All: I Really Had a Ball," contained a copyright notice in the form: "©1976 Friends & Company, A division of Bullseye Record Inc."

Here is her response:

I had access to the album referenced in this request and believed it contains such a copyright notice but as I am unsure of the exact wording, I hereby demand strict proof.

She admits in Article 23, that the United States Copyright Office indicated on the renewal application of Friends & Company, a division of Bullseye Records Inc. was the original copyright claimant for the song "Last Night Change At All; I Really Had a Ball" as indicated on the deposit copy. Joseph Bannana, president of Bullseye Records and Dammit publishing paid for the whole music session, the masters, and the production: therefore he owns it. The claims that she is making is completely frivolous, untrue, and outlandish. As stated before, this is a

frivolous lawsuit from start to finish, and I respectfully asked the honorable Judge Bates to dismiss this ridiculous lawsuit in its entirety.

Dear Your Honor, if you noticed that the second article of Esther Williams contract in which she presented stated this agreement shall commence December 19, 1975 and was four one-year periods. That means that in 1979 Esther's contract was over. In 1981, Esther was dropped from the label because of her inability to reach the keys on the compositions. The deal that she makes reference to between Robert Curington and Universal Def Jam commenced in June 22, 2004, for she had been dropped, 20 earlier. Please refer to Article 2 of the contact that she submitted from 1979 to 2004 when I granted mechanical licenses to Deaf Jam. If my math is correct, that is over 20 years; therefore she is no standing.

Furthermore, I never gave Amaru or Universal Music any permission or a mechanical license for the late artist Tupac Shakur and I never received a dime and it sold over 2 million copies. In regards to Ghostface Killahs, who which I did grant them a mechanical license, and all of the royalties are held up by Universal Music Publishing. I only received $2500 for the master use which Esther Williams contract states that it was a Bullseye's right. It sold over 225,000 units.

Pursuant to any questions of royalties owed by Esther Williams from her recording of "Last Night Change It All: I Really Had a Ball" or other songs for the entire album, plus money expended for #1. the costume, #2. the personal clothing, #3. the personal TV delivered by me ,and paid for by the company, #4. the dance, choreography, & travel for choreographer, #5. the travel & hotel to Miami, and #6. the $10,500 that she fraudulently received from Japan and Sanctuary Records must be recouped by Friends and Company, and Dammit Publishing, a division of Bullseye Records.

## A G R E E M E N T

AGREEMENT made as of this 19th day of DECEMBER 1975, by and between FRIENDS & CO., a division of BULLSEYE RECORDS, INC., 108 Sherman Avenue, New York, New York (hereinafter referred to as "Company" and ESTHER WILLIAMS, E.W. 4715 RUSSELL AVE #1 MOUNT RAINER MARYLAND 20822 (hereinafter referred to as "ARTIST").

### W I T N E S S E T H:

In consideration of the covenants and conditions herein contained and other good and valuable considerations, the parties hereto agree as follows:

1. The Company hereby engages the Artist's exclusive personal services in the production of phonograph records, and Artist hereby accepts such engagement and agrees to render such exclusive services to Company in accordance with the terms and conditions as hereinafter set forth.

2. This Agreement shall commence as of the date hereof, and shall continue in force for an initial period of one (1) year from such date (hereinafter referred to as the "Initial Period"). Artist grants to Company four (4) separate irrevocable options, each to renew this Agreement for a period of one (1) year. (The Initial Period and option periods shall be collectively referred to in this Agreement as the "Term". Said option periods are to run consecutively beginning on the expiration of the initial period, upon the same terms and conditions applicable to the initial period, unless elsewhere provided. Each such option period shall be deemed automatically exercised by Company unless Company gives Artist written notice prior to the expiration of the initial period, or extended period(s) as the case may be, of its intention not to exercise a given option.

3. (a) During the term of this Agreement, Artist will render services at recording sessions at studios to be designated by Company and at times and places to be designated by Company for the purpose of making master recordings. The producer of such recording sessions and the musical compositions to be recorded shall be designated by Company, and each master recording made hereunder shall be subject to Company's approval as commercially satisfactory for the manufacture and sale of phonograph records. Upon the request of Company, Artist shall re-record any musical composition until Company approves that same is a commercially satisfactory master recording.

(b) During the term hereof, Artist will perform a minimum number of master recordings which are set forth in the schedule attached hereto and made a part hereof (hereinafter referred to as Schedule "A"). Notwithstanding the foregoing, Artist shall record additional master recordings in excess of the minimum at Company's sole discretion and upon Company's request. In the event that during any year of the term of this Agreement, Artist records more than the minimum number of master recordings required to be recorded in such period as is provided in said schedule, then such additional sides may be recorded in excess of said minimum and may be applied at Company's option, in diminution of the minimum number of master recordings required to be recorded during any subsequent period.

05/18/2007 14:20   HenrichsenSiegel                (FAX)12029667464              P.009/016

(c) Should Artist for any reason, fail to, or be unavailable for the rendering of services hereunder and for the recording of any master hereunder, then the term of this Agreement shall be automatically extended for a period of time equal to the period of such failure or unavailability; In the alternative, Company shall have the option to reduce the minimum number of sides to be recorded for the term by the number of sides which were scheduled to have been recorded at the recording session from which Artist was absent, and Company shall have the right to charge any of its out-of-pocket expenses in respect of such session against Artist's royalties, if and when earned.

(d) If, by reason due wholly or partly to any labor controversy or adjustment thereof, or to any other cause not entirely within Company's control or which Company could not by reasonable diligence have avoided, Company is materially hampered in the recording, manufacture, distribution or sale of records, or Company's normal business operations become commercially impractical, then, without limiting Company's rights in any such event, Company shall have the option without liability to suspend operation of the term of this Agreement for the duration of any such contingency by giving a written notice thereof; and, at Company's election, a period of time equal to the duration of such suspension shall be added at the end of the then current period of the term hereof; and then such period and the term of this Agreement shall be accordingly extended.

(e) The Company agrees to advance all costs of recording under this Agreement. Such costs shall include, but are not limited to, all costs incurred in or incident to the recording of the Artist's performances, including musicians', singers' and actors' salaries and fees, fees payable to unions and to union trust funds, costs of arrangements, copying charges, cartage of musical instruments, studio technicians, tape, editing, dubbing, and redubbing costs and expenses, and all advertising and promotional costs and expenses. These recording costs and all payments to Artist, if any, with respect to the recordings made hereunder, shall be charged to Artist as non-returnable advances against the Artist royalties payable to Artist under this or any other Agreement with Artist, and shall be deducted from Artist royalties when earned.

(f) If Company does not record the minimum number of record sides specified in Schedule "A" hereof, Company's liability to Artist shall be limited to the payment of union scale payments or its equivalent.

4. Company shall be in sole and exclusive control of the distribution of phonograph records pursuant hereto and shall have the right to distribute, market and exploit the same directly or through any subsidiary or affiliated company, franchise holder or licensee or distributor or any other person anywhere in the world. With the exception of the instant Agreement and without waiving any of Company's rights under the instant Agreement, Company shall have the right, in good faith, to cancel contracts entered into between Company and any third party involving the distribution of phonograph records, to adjust or settle claims or disputes of any kind and to give rebates, credits and allowances and to accept and/or request "returns" to such extent as it may deem necessary, reasonable or proper in its sole discretion. Artist's phonograph records may be sold separately or in groups with one or more other phonograph records distributed by Company.

-2-

5.    (A) Company and its subsidiaries, affiliates, licensees and assignees or any of same, shall have the exclusive and perpetual right to all the products of Artist's services hereunder, including, but not limited to, the <u>exclusive right</u>:

(i) to manufacture, advertise, sell, lease, license or otherwise use or dispose of in any or all fields of use, and by any method now or hereafter known, throughout the world, phonograph records and other reproductions embodying the performances to be recorded hereunder, upon such terms and conditions as Company may elect, or at Company's discretion, to refrain therefrom. Company makes no representation or warranty that any minimum number of records will be manufactured or sold pursuant hereto by Company or any of its subsidiaries, affiliates, licensees or assignees.

(ii) to use and allow others to use any name by which Artist is presently known or has in the past been known, or may be known in the future, during or subsequent to the term of this agreement, whether such name is Artist's legal name or a professional name, as well as Artist's likeness and biographical material concerning Artist for advertising and purposes of trade, in connection with phonograph records made pursuant to this agreement.

(iii) to release phonograph records of the compositions performed by Artist and recorded hereunder on any medium or device now or hereafter known under any names, trademarks or labels which Company and its subsidiaries, affiliates, assignees and licensees may from time to time elect.

(iv) to publicly perform the phonograph records and to permit the public performance thereof by means of radio broadcast, television, in motion pictures or by any other method now or hereafter known.

(v) the sole, <u>exclusive and perpetual</u> ownership of and in <u>masters</u> made hereunder, including, but not limited to, all master recordings, matrices and similar devices, and records or other reproductions of the foregoing, and the performances embodied in the foregoing and in such masters or reproductions, and the copyrights thereon throughout the World.

(vi) to incorporate, from time to time, in masters and in records to be made hereunder, instrumentations, orchestrations and arrangements owned or controlled by Artist in compositions recorded hereunder.

(vii) to exclusively use and exploit and to license others to use and exploit commercial tie-ups of any sort and nature arising out of or connected with the Artist and Artist's name, both actual and professional, and the recordings released pursuant hereto.

(B) Company's right, title and interest or privileges (including, without limitation, those enumerated in Paragraph (A) above) to or in connection with any of the results or proceeds of Artist's services or efforts hereunder, outlive, continue after, and are not affected by the expiration, suspension or termination of this Agreement.

(C) Artist acknowledges an understanding of the record business and accordingly that Company will have the right to produce, distribute, promote, advertise and sell, as Company sees fit in its sole discretion, phonograph records recorded by other recording Artists whether or not same may be competitive with phonograph records recorded by Artist without limitation whatsoever.

-3-

15. This Agreement sets forth the entire agreement between the parties with respect to the subject matter thereof. No modification, amendment, waiver, termination or discharge of this Agreement shall be binding upon the Company unless confirmed by a written instrument signed by an officer of the Company. No waiver of any provision or any default under this Agreement shall affect the rights of the Company thereafter. Should any paragraph or provision of this Agreement be void, invalid or inoperative, such decision shall not affect any other provision or paragraph hereof, and the remainder of Agreement shall be effective as though such void, invalid or inoperative paragraph or provision had not been contained herein. This Agreement shall be construed pursuant to the laws of the State of New York, applicable to Agreements to be wholly performed therein. In the event that there is a claim by Company against Artist for a default of Artist's obligations under this Agreement, or a breach of Artist's warranties and representations, then and in that event, pending the determination of such claim by Company involving such breach or default by Artist, Company may, at its election, withhold payment of Artist's royalties.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day first above written.

FRIENDS & CO., a division of
BULLSEYE RECORDS, INC.

By: /s/ Joseph Bermanzohn

By: /s/ Esther Williams
    Artist

-9-

**CONFIDENTIAL**

## AGREEMENT

This Agreement is made as of June 15, 2000 between Esther Williams, located at 1409 Delafield Place, NW, Washington, DC 20011-4346 USA (hereinafter "Artist") and Mercer Street Music, Inc., located at 2-1-4, #204, Hanegi, Setagaya-Ku, Tokyo 156-0042 Japan (hereinafter "Company").

WHEREAS, Artist is the recording artist for the recording entitled "Last Night Changed It All (I Really Had A Ball)" by Esther Williams (hereinafter "Recording") ; and

WHEREAS, Company desires to exploit the Recording exclusively throughout Japan (hereinafter "Territory").

WHEREAS, Company acknowledges that Artist has used good faith efforts to determine ownership of the master recording of the Recording (hereinafter "Master").

WHEREAS, Company acknowledges that Artist was unsuccessful in definitively determining legal ownership of the Master and is able to grant only those rights in law held by her as the Artist of the Recording.

NOW, THEREFORE, in consideration of the foregoing and of the mutual covenants and premises hereinafter set forth, it is agreed as follows:

1. Grant of Rights.

    (a) Artist hereby grants to Company during the Term as defined herein below, any and all rights in law held by Artist in connection with the Recording (hereinafter "Artist Rights").

    (b) Pursuant to the Artist Rights granted to Company in paragraph 1(a) above, any Re-mixing, Editing and/or Alteration to the Recording is subject to the following conditions:

       (i) The Company shall be responsible for paying all costs and not charge or deduct such costs from the Artist in any way. Company shall notify Artist in respect to such costs and charges.

       (ii) Artist shall be deemed the owner of the new Remixed, Edited and/or Altered Recording made by Company (hereinafter "Remixed Recording"). The costs incurred for production shall not be recouped against Artist's royalties.

*1 of 4*

**CONFIDENTIAL**

2. Representation and Warranties/Indemnification:

(a) Company hereby indemnifies and holds harmless Artist from and against any loss, liability, judgment, cost or expense (including legal expenses and reasonable attorneys' fees) of any kind or character suffered or incurred by Artist that results from and relates to Company's use, exploitation, promotion, broadcast, advertising, marketing, public performance, distribution, manufacture, reproduction, sale and rental, licensing and assignment to any third party or parties of the Recording and/or Remixed Recording.

(b) During the term hereof, Artist agrees not to grant to any other party the Artist Rights being granted under this Agreement.

3. Term:

(a) The Term of this Agreement shall commence as of June 15, 2000 and continue for a period of ONE (1) year from the date of first commercial release of the Remixed Recording.

(b) Commencing immediately after the expiration of the Term, Company shall have non exclusive sell-off period of SIX (6) months.

4. Payments:

In consideration of the Artist Rights granted hereunder, Company shall pay Artist the following:

(a) Non-returnable Advance of FIVE THOUSAND and FIVE HUNDRED AND FIFTY FIVE and 55/100 US DOLLARS (US$5,555.55) (less withholding tax of TEN (10%) percent), which shall be recoupable from royalties specified hereunder and payable upon execution of the Agreement. This Agreement shall not become in effect until the advance set forth herein has been paid to Artist.

(b) Royalty of EIGHTEEN (18%) percent of the PPD Price on ONE HUNDRED (100%) percent of records shipped.

(c) Royalty of FOURTEEN (14%) percent of the PPD price on ONE HUNDRED (100%) percent of TV advertised compilation records shipped, provided, however, this deduction will be applied for TWO (2) accounting periods, and then reverts to EIGHTEEN (18%) percent.

(d) For calculation of compilation records, royalty rate shall be prorated to the number of Recordings used against the total number of tracks on the album.

2 of 4



WILLIAMS 0012



(c) Subject to prior written consent of Artist, Company may add, resequence and make other alteration to the original form of the Remixed Recording for the purpose of successfully market the Remixed Recording in the Territory.

8. Governing Law:

The parties hereto agree that this Agreement and resolution of any disputes or litigation arising hereunder shall be governed by the Laws of the USA jointly and the venue of such litigation shall be the USA.

9. Entire Agreement:

This Agreement constitutes the entire agreement between the parties and cannot be modified except by written agreement duly executed by both parties. The parties agree that there are no representations or agreements not modified herein.

IN WITNESS WHEREOF, the parties have caused this Agreement to be effective as of date first written above.

ARTIST:                                          COMPANY:

*Esther Williams*                                *[signature]*

BY: ESTHER WILLIAMS                              MERCER STREET MUSIC, INC.
DATE: 6/9/00                                     BY: HIDEKI NINOMIYA
                                                 TITLE: PRESIDENT
                                                 DATE:

4 of 4

WILLIAMS 0013



SIDE A
1 - YOU GOTTA LET ME SHOW YOU (5:38)
(A. Walker E. Williams A. Walker)
BMI Damit Music Pro/Arr Eddie Drennon
2 - EVERY DOG HAS HIS DAY (3:30)
(R. Norman)
BMI Damit Music Pro/Arr Roy Norman Ronor Int'l
3 - IT FEELS REAL GOOD (4:11)
(G. Carmichael E. Williams)
BMI Damit Music Pro/Arr Gregory Carmichael
4 - LOVE TRAIN (3:29)
(R. Norman G. Nissenson)
BMI Damit Music Ascap Po t, M.
Pro/Arr Roy Norman Ronor Int'l

SIDE B
1 - THE VERY THOUGHT OF YOU (3:24)
(E. Drennon)
BMI Damit Music Pro/Arr Eddie Drennon
2 - ITS ALL IN THE WAY YOU DANCE (4:24)
(P. Clements)
BMI Damit Music Pro/Arr Eddie Drennon
3 - NEVER SAY NEVER (3:22)
(R. Norman)
BMI Damit Music Pro/Arr Roy Norman Ronor Int'l
4 - LAST NIGHT CHANGED IT ALL
(I REALLY HAD A BALL) (4:21)
(J. Wheeler)
BMI Damit Music Pro/Arr Eddie Drennon
5 - SEARCHING FOR SOMEBODY ELSE (3:
(G. Carmichael E. Williams)
BMI Damit Music Pro/Arr Gregory Carmichael

I would like to extend my special thanks to the B B S    for
their musical strength on You Gotta Let Me Show You, The
Thought Of You Its All In The Way You Dance and Last Night Changed
It All. And a special thanks to Ralph and Joe Bach.
                                                        Esther Williams

MASTERED AT FRANKFORD WAYNE N. Y.
FRONT AND BACK PHOTO BY DOMINIQUE

Friends & Co. A Division Of Bullseye Records Inc.
1976

# Ashley Brooks
## PUBLISHING
## BMI

Robert Curington

1410 Rosewood St.

Durham NC, 27701

*Robert B Curington* (signature)

TEL: (919) 687-0094                    Fax (919) 687-0094

E-Mail: ACURINGTON@nc.rr.com